345 So.2d 216 (1977)
ADD CHEMICAL COMPANY, Plaintiff-Appellant,
v.
GULF-MARINE FABRICATORS, INC., Defendant-Appellee.
No. 5872.
Court of Appeal of Louisiana, Third Circuit.
April 13, 1977.
Rehearing Denied May 10, 1977.
Writ Refused July 1, 1977.
Litton, Pierce & Malone by A. Clay Pierce, Jr., Baton Rouge, for plaintiff-appellant.
W. Paul Hawley, Lafayette, for defendant-appellee.
Before GUIDRY, FORET and HEARD, JJ.
GUIDRY, Judge.
Plaintiff, Add Chemical Company (hereinafter referred to as Add) instituted this action to recover damages for the loss it sustained when certain chemical products it was storing in tanks leased from defendant leaked from the said tanks. Defendant Gulf-Marine Fabricators, Inc. (hereinafter referred to as Gulf), answered the plaintiff's petition, admitting only that an "as is" lease of its storage tanks was negotiated with plaintiff and that plaintiff suffered a loss of the material stored therein. Defendant generally denied all other allegations of plaintiff's petition. Defendant filed a reconventional demand against plaintiff seeking *217 lease payments due and attorneys fees. The trial court rendered judgment dismissing plaintiff's suit and granted judgment on the reconventional demand in favor of Gulf for one month rental in the amount of $1500.00 but made no award of attorneys fees. Add appeals. Gulf has neither appealed nor answered the appeal of Add.
The trial court found that there was a lease contract existing between plaintiff and defendant under which agreement the lessee assumed responsibility for the condition of the storage tanks. Plaintiff contends that the trial court erred in finding that the lease was an "as is" lease. Plaintiff also assigns as error the trial court's failure to find that the defendant knew or should have known of the leakage problems in the tanks at the time of the agreement. Appellant does not question the correctness of the trial court's judgment on the reconventional demand.
A review of the facts show that Gulf owned a battery of large storage tanks which were located at its facility near New Iberia, Louisiana and that Add, in December of 1974 contacted Gulf in regards to leasing these storage tanks. Add needed storage space for the holding of certain mixed glycols in liquid form which were produced at its plant in Abbeville, Louisiana.
Claude Harkins, executive director of Add, who was in charge of locating the additional storage tanks, contacted Jack Merille, Vice-President of Gulf, and set up an appointment to go to New Iberia to inspect the tanks. The inspection was held on December 30, 1974, there being present, Phil Nugent, President of Gulf, Jack Merille and Claude Harkins. At this time Add negotiated for the use of four storage tanks: One large 6600 barrel tank, one small 500 barrel tank and two 1000 barrel tanks. All of the tanks were bolt constructed, closed steel containers. A physical inspection of the tanks by Harkins revealed that the large 6600 barrel tank, which had holes in the roof, and the two 1000 barrel tanks which had some crude oil remaining in them, would be satisfactory. There was no evidence of any oil leakage around the tanks. Defendant agreed to repair the roof of the large tank as well as clean the remaining tanks. It was also agreed that Bob Naylor, Add's plant manager in Abbeville, would come to the site later and examine the tanks to determine if the product could be stored therein without contamination. The parties agreed on a monthly rental of $1550.00 for a period of one year.
Shortly following these negotiations, which occurred in the last part of December, 1974, Gulf sent Add a proposed lease agreement. The agreement forwarded to Add's Houston office was signed by Gulf's President, Phil Nugent. A copy of this agreement was introduced in evidence as plaintiff's exhibit 1. To summarize, the agreement provided for the lease of the storage tanks located at Gulf's facility in New Iberia for a term of one year commencing on January 1, 1975 in consideration of a monthly rental of $1550.00. The lease further provided that the "Lessor will not be responsible for damages caused by leaks in the roof, by bursting pipes by freezing or otherwise, or by any vices or defects of the leased property, or the consequences thereof." Add received the proposed lease from Gulf but never signed the same, nor did Add ever contact Gulf regarding its provisions. The lease remained in Add's possession.
On January 20, 1975 Merille contacted Harkins in Houston to inform him that one of the tanks was ready for inspection. Harkins thereafter contacted Bob Naylor in Abbeville to inform him of the same. In response to this Naylor traveled to New Iberia to check the tank however, he was unable to get into the facility due to the fact that the roads into the tank battery were impassable. Harkins was again contacted by Merille on February 4, 1975 at which time he was told that the two 1000 barrel tanks were ready. On February 5, 1975 Naylor again went back to New Iberia to examine the tanks. On this occasion Naylor did physically inspect the tanks. Naylor testified that he climbed down into one of the 1000 barrel tanks and after closing *218 the hatch could not see the light of day. Closer inspection with a flash light revealed no evidence of corrosion, wear, or abrasion. After visually inspecting the outside of the other tanks he could see no holes or dents or tears in the surface of any of the tanks. Finding the tanks to be satisfactory Naylor made arrangements for Matalack Inc., to haul the glycol from tankage in Abbeville to New Iberia. Three loads were made on February 6, 1975 and two on the following day, February 7, 1975. All of the loads were pumped into one of the 1000 barrel tanks by the Matalack truck driver.
On February 7, 1975 Naylor went to New Iberia to check on the operation and to examine the 500 barrel tank. Upon arriving at the site Naylor saw that the 1000 barrel tank into which the glycol had been pumped was leaking. He stated that you could see the liquid flowing from underneath the tank. The leakage was being contained by a dyke or firewall which was built around the circumference of the tank. At this time Naylor had the remaining liquid in the 1000 barrel tank pumped into the 500 barrel tank. Naylor returned to the site on Monday, February 10, only to see that the 500 barrel tank was also leaking. Having no other place to store the 4000 gallons of liquid remaining in the leaking tank it was all allowed to dissipate in the sump around the tank.
Plaintiff claims a loss of 288,600 pounds of mixed glycols at a cost of 11.5 cents per pound or $33,189.00. Additionally plaintiff seeks recovery for the expense of transporting the glycol from Abbeville to New Iberia which amounted to the sum of $717.37.
The testimony of Phil Nugent and Jack Merille indicates that the tanks in question were first used by Gulf in the early part of 1973 to store diesel fuel. Thereafter, in late 1973, the tanks were leased to Earl Bishop until December of 1974 for the storage of crude oil. Both Nugent and Merille testified that they had no knowledge of any leaks in the tanks, nor had they been informed of any leaks in the tanks. They stated that Earl Bishop had never complained about any leaks in the tanks.
Merille testified that at the time of the negotiation on December 30, 1974 he told Harkins, the Add representative that there might be a problem storing glycol in these bolted tanks, to which Harkins responded that he had no doubt his product would stay in the tanks. Nugent also at the negotiations, remembered Merille's conversation with Harkins, although Harkins testified he had no recollection of this discussion.
Merille testified that the problem in storing glycol in bolted tanks arises from the fact that glycol is heavier than oil or water. In this regard Add's plant manager, Naylor, testified that there was a difference between a welded and a bolted tank in that in the bolted tanks you have to make sure the gaskets are in good shape, otherwise the tanks will leak.
The testimony of Harkins and Charles Duesing, President of Add, indicates that in the past they had never experienced any particular problem in storing glycols in bolted tanks. However, Harkins did state that it was slightly harder to contain glycol than other materials.
The record also shows that just prior to the negotiations with Add, Gulf had been contacted by Maurice Keller in regards to leasing the tanks. Keller at the time of his negotiations with Gulf also contracted with Gulf to purchase the crude oil remaining in the tanks. Keller admitted that he removed the remaining crude oil from the tanks and had subsequently stopped payment on the check issued to Gulf for the oil. Keller never leased the tanks. Keller who testified on behalf of the plaintiff had previously done transportation work for plaintiff. Much of Keller's testimony regarding the alleged leaking problem in the tanks was properly excluded by the trial court as hearsay. Under cross-examination Keller positively testified that his inspection of the tanks revealed no problem or evidence of leaks, nor did he have any personal knowledge of the tanks ever leaking. Keller did testify that his inspection of the tanks indicated a possible gasket problem, but added that this was not uncommon.
*219 Although Add never executed the written lease agreement forwarded to it in early January, 1975, it does not seriously question the trial court's finding that a lease agreement existed between Add and Gulf. Like the trial court we determine that a lease agreement did exist between plaintiff and defendant.
A lease may be made either by written or verbal contract. R.C.C. Article 2683. The essentials of a "lease" are the thing, the price and the consent. R.C.C. Article 2670. In the instant case all the essentials for a valid lease are present. The parties agreed upon the thing and the price. The element of consent is clearly evidenced by the actions of the parties. R.C.C. Articles 1816 and 1817.
Having determined that a valid agreement of lease existed between Add and Gulf, the issue presented for determination is whether by this agreement the lessee assumed responsibility for the condition of the storage tanks. If so, the lessor would not be liable for injury caused by the defect, unless it is found that the lessor owner knew or should have known of the defect, or received notice thereof and failed to remedy it within a reasonable time.
LSA-R.S. 9:3221 provides:
"The owner of premises leased under a contract whereby the lessee assumes responsibility for their condition is not liable for injury caused by any defect therein to the lessee or anyone on the premises who derives his right to be thereon from the lessee, unless the owner knew or should have known of the defect or had received notice thereof and failed to remedy it within a reasonable time."
Plaintiff, in denying that it was its intent to assume the responsibility for the condition of the storage tanks, relies principally on the testimony of Claude Harkins that no mention was made to him of an "as is" lease at the negotiations on December 30, 1974. To the contrary, Phil Nugent, President of Gulf testified that he told Add's representative, Harkins, during these negotiations that Add would have to assume the responsibility for the condition of the tanks. Plaintiff further offered the testimony of its President, Charles Duesing who stated that he would have never signed an "as is" lease and for that reason the proposed lease received from Gulf in early January was totally unacceptable.[1] Nevertheless the testimony of both Harkins and Duesing indicates that they went ahead and used the tanks knowing full well at the time that Gulf had taken the position that Add was to assume responsibility for the condition of the tanks. Further, Harkins, who had spoken with Merille on two or three occasions after receiving the proposed lease admitted that he never brought to Gulf's attention Add's disagreement with the lease provisions. Likewise Duesing never contacted Gulf in regards to the lease being unacceptable.
R.C.C. Article 1816 provides in pertinent part as follows:
"Actions without words, either written or spoken, are presumptive evidence of a contract, when they are done under circumstances that naturally imply a consent to such contract . . ."
R.C.C. Article 1817 provides in part as follows:
"Silence and inaction are also, under some circumstances, the means of showing an assent that creates an obligation;. . ."
As stated hereinabove the trial court found that under the lease agreement between plaintiff and defendant the plaintiff agreed to assume the responsibility for the condition of the storage tanks. In this connection R.C.C. Article 1818 provides:
"Where the law does not create a legal presumption of consent from certain facts, then, as in the case of other simple presumptions, it must be left to the discretion of the judge, whether assent is to be implied from them or not."
We find ample evidence in the record to support the trial court's conclusion that *220 plaintiff assented to assume the responsibility for the condition of the storage tanks. Suffice it to say that the plaintiff knew of defendant's express intention to lease the tanks "as is" and that plaintiff did in fact, without any expression of its intent to the contrary, lease and use the tanks.
Although we have hereinabove determined that the lease existing between the plaintiff and defendant provided for the lessee to assume responsibility for the condition of the storage tanks the lessor may still be held liable for the injury caused by the defect if it be found that the lessor knew or should have known of the defect in the storage tanks and failed to remedy it. LSA-R.S. 9:3221.
Our review of the record reveals that there is not a scintilla of credible evidence to support a conclusion that the lessor defendant knew or should have known that the tanks in question leaked. To the contrary the evidence shows that the defendant, who had leased the tanks for crude oil storage up until December 1974, had neither experienced nor been informed of any leakage problems in the tanks. Further the testimony of all the parties indicates that a physical inspection of the tanks on December 30, 1974 showed them to be in satisfactory condition.
We agree with the trial court finding that the evidence does not support the conclusion that the defendant knew or should have known of the leakage problems in the tanks at the time of the agreement. Accordingly we find that the plaintiff is not entitled to recover damages from defendant for the loss of the glycol which it had stored in the leased tanks.
Although appellant does not specifically take issue with the trial court's award to Gulf, plaintiff in reconvention, of the sum of $1500.00 for one month rent, we find this to be error.
The record leaves no doubt but that the tanks, as leased, were not suitable for the containment of glycols. Although, under the circumstances of this case, the lessor was without fault (the lessee having assumed responsibility for the condition of the tanks) the lessee is entitled to an annulment of the lease because the leased property was not suitable for the purpose intended. R.C.C. Article 2699; Truck Equipment Company v. O'Reilly d/b/a Port Distributing Company, 142 So.2d 184 (La.App. 4th Cir. 1962). The lessee being entitled to an annulment of the lease, it must necessarily follow that Gulf, plaintiff in reconvention, is not entitled to recover the rentals provided for therein.
For the above reasons we reverse the trial court insofar as it awards judgment in favor of Gulf, plaintiff in reconvention, for the principal sum of $1500.00, and now order that the demand of Gulf, in reconvention, be dismissed with prejudice. In all other respects the judgment of the trial court is affirmed. The costs of this appeal are to be borne equally by appellant and appellee.
REVERSED IN PART, AFFIRMED IN PART, AND RENDERED.
NOTES
[1] As quoted above the lease provided that the lessor would not be responsible for any vices or defects of the leased premises, or the consequences thereof.