573 So.2d 481 (1990)
GULF AMERICAN INDUSTRIES
v.
AIRCO INDUSTRIAL GASES.
No. 89-CA-709.
Court of Appeal of Louisiana, Fifth Circuit.
June 1, 1990.
*483 Michael H. Ellis, Appellate Counsel, Chehardy, Sherman, Ellis & Breslin, Metairie, Clarence F. Favret, Jr., Favret, Favret, Demarest & Russo, New Orleans, for Airco Indus. Gases, defendant-appellant.
John H. Brooks (Gordon Konrad, of counsel), Gretna, for plaintiff-appellee, Gulf American Industries.
Before KLIEBERT, BOWES and GOTHARD, JJ.
BOWES, Judge.
Plaintiff/appellee, Gulf American Industries (Gulf American) filed suit against defendant/appellant, Airco Industrial Gases (Airco), for damages for breach of contract, false representation and redhibition arising out of a lease-purchase agreement. Airco filed a reconventional demand against Gulf American for balance due on account and attorney's fees. After a judge trial on the merits, judgment was rendered in favor of Gulf American and against Airco for $680,000.00. Airco's reconventional demand against Gulf American was dismissed. The trial judge gave well-written reasons for judgment and we affirm some of his decisions, but amend the judgment in favor of the plaintiff, Gulf American, to award damages of $66,775.00.
*484 After oral argument, and without leave or permission of this court to file same, and without any kind of stipulation or agreement from opposing attorneys, counsel for Gulf American filed a supplement to his brief, with an order from the trial court attached to it, stating that the trial court had considered the deposition of Noel Blackman in reaching its decision. Counsel then filed a second motion seeking to supplement the record with this deposition. Both motions were taken under advisement and, for reasons expressed later in this opinion, are denied.
In the late 1970's, Gulf American was a seafood company which bought, processed and sold shrimp. At the time of the lease purchase agreement at issue, it was owned and operated by Charles Turan.
In 1975, Turan hosted a convention at which he met Noel Blackman, president of the Shore Lobster Company. According to Turan's testimony, Turan and Blackman discussed the possibility of opening up a market for Individually Quick Frozen (IQF) Shrimp. Also according to Turan, at some time thereafter, Blackman offered Turan an agreement wherein Shore Lobster Co. would purchase from Gulf American two million pounds of IQF shrimp per year. Shore Lobster agreed to pay Gulf American 30 cents per pound for processing the shrimp, and an additional 40 cents a pound for profit. Shore Lobster also provided $50,000.00 in advance to finance the arrangement.
During that period of time, Turan says he was approached by Airco through its sales representative, Mr. Amos Beecher. Airco is a company which manufactures and sells cryogenic gases and fluids. It also sells and leases equipment which utilizes these gases and fluids. At the time of initial contact, Turan says he had no interest in Airco's products. However, according to Turan, after Gulf American and Shore Lobster Co. had come to an agreement for a future contract, Turan asked Beecher whether Airco could provide machines to produce IQF shrimp. Turan provided Airco with written details of the seafood which Gulf American wanted to process by freezing. At one point in the trial, Turan testified that he informed Beecher of the agreement Gulf American had entered into with Shore Lobster and, at another point, said he had done so, but indirectly. At a third point, Turan testified that he had told them that he had entered into a contract, but he did not tell them with whom. Beecher testified that he was not informed of the Shore Lobster agreement. Turan also testified that Beecher told him that Airco had machines at plants in Oregon which were producing IQF shrimp. Beecher testified that he could not remember whether any plants were producing IQF shrimp when he was negotiating with Turan.
By a letter dated February 25, 1977, Airco submitted to Gulf American a proposal to sell a Model KF 13-200 Kwikfreeze spiral freezer (Freezer). The proposal included several assertions, including the following which was of paramount interest to Turan and Gulf American.
"This spiral freezer has the following capabilities at the stated conditions:
* * * * * *
Product: Raw, peeled shrimp, 100-150 count.
Temperatures: Inlet 80 F Outlet 0 F
Belt Loading Density: 1 lb./square feet of belt.
Approximate CO Consumption: 1.75 lbs. of CO /lb. of shrimp.
Approximate Dwell Time: 4.5 to 5 minutes.
Capacity: 1200 pounds per hour."
This proposal was drawn up by John Harr, who was the Southern manager for Airco. Harr testified at trial that he knew of no freezer already producing 100-150 count IQF shrimp at the time he prepared the proposal. Steven Anthony, who was a Field Application Engineer, was consulted and he testified that he concurred in the assertion that the freezer could process 100-150 count IQF shrimp.
After Turan read the proposal, he says he decided to purchase the Freezer. Turan was told by Airco that, for financing purposes, *485 the transaction would be conducted as a lease-purchase agreement.
On February 28, 1977, the parties signed a five-year lease-purchase agreement. The pre-printed portion of the agreement contains, among other agreements, the following waivers:
* * * * * *
6. AIG [Airco] makes no representations or warranties with respect to the Equipment other than that it shall meet the description thereof set forth elsewhere in this Agreement.
* * * * * *
14. AIG [Airco] shall have no liability hereunder to User for consequential damages, under any circumstances.
Turan testified that these waiver clauses were not called to his attention nor were they explained to him when he signed the agreement. Further, Addendum # 1 of the typewritten portion of the agreement gives plaintiff the option to purchase the Freezer at any time during the lease term (5 years) for the price of $58,700, plus applicable taxes, less $400.00 for each monthly rental paid during the lease period. Additionally, the addendum contains the following lease cancellation provision, which was bargained for and demanded by the plaintiff:
"If during the initial six month term of the lease the user notifies AIG [Airco] in writing of User's desire to return the Kwikfreeze to AIG, AIG will accept such return in accordance with Paragraph 7 [deals with care, maintenance and condition of the lease equipment] and the termination of this agreement for the sum of $10,000.00 less $400.00 for each month lease payments have been paid."
Gulf American and Airco also entered into a carbon dioxide sales and rental agreement whereby Airco would supply the carbon dioxide to be used by the freezer.
In preparation for the Freezer and to automate the entire process, Gulf American purchased equipment and modified its physical plant. The petitions and pleadings in this case allege that Turan spent around $80,000.00 for these purposes. However, the only evidence submitted to corroborate this statement were two folders of invoices, receipts, etc., which were simply identified "in globo" and there was not even an adding machine tape to show the total amount, nor were the contents identified specifically with the plant renovation. The Freezer was then delivered and installed and Turan began production.
The Freezer failed to adequately process the 100-150 count shrimp from the very beginning. Turan contacted Airco and began what was to be a six-month attempt to remedy the problem, ultimately concluding with the cancellation of the lease. Despite repeated attempts by Beecher and Anthony, the Freezer was never able to process 100-150 IQF shrimp. The shrimp would get caught in the mesh of the Freezer's conveyor belt and would continually re-enter the machine, instead of coming off at its final turn. Airco initially installed a scraper blade at the end of the belt's final turn to knock the shrimp off the belt. The blade, however, cut the shrimp in half. This created a layer of frozen shrimp meat on the belt, which continually went around and re-entered the machine until the conveyor belt would freeze solid and jam the machine, causing it to stop. Airco then fabricated and installed a heavier stainless steel blade; however, the problem continued.
Airco next recommended that, when the machine would jam, Turan should hose the conveyor belt with water to remove the layer of shrimp meat which was frozen to the belt. Every time Turan did this, the shrimp in the conveyor belt fell to the floor, rendering them unmarketable.
In addition, the shrimp that did not get cut in half also did not process satisfactorily. These shrimp were extremely dehydrated and white and sometimes came out in clumps of two or three.
To alleviate the clumping problem, Turan, at Airco's suggestion, installed a feeding machine and then a shaker/dryer machine. These measures failed to correct the clumping problem. At trial, John Harr testified that the only way to prevent clumping would have been hand-feeding *486 the shrimp into the machine. Other Airco representatives, Beecher and Anthony, testified that hand feeding was not the answer. Airco's proposal stated that the machine could process 1,200 pounds of 100-150 count shrimp, or from 120,000 to 180,000 shrimp per hour. The Freezer's conveyor belt is 13 inches by 200 feet. Only a two-foot portion of the belt is outside of the machine.
At trial, Steven Anthony testified that he had anticipated sticking problems. However, both he and Harr testified that they did not inform Turan of the potential sticking problem.
On November 10, 1977, Gulf American sent Airco notice terminating the lease and requesting that the Freezer be removed from its premises.
Because of the failure of the Freezer to perform satisfactorily, Turan testified that Gulf American apparently could not meet its contract with Shore Lobster and ultimately lost the contract and the financing it provided. In addition, Gulf American lost its suppliers and ran into debt borrowing money to keep the business afloat. The business was terminated for undisclosed reasons in December of 1979.
In its first assignment of error, Airco alleges that the trial court erred in holding that the contract between the parties was a contract of sale and not a lease.
In its second assignment, Airco alleges that the trial court erred in finding that Airco's proposal of February 25, 1977, amounted to a warranty and constituted an agreement between the parties, despite the fact that it was not contained in the contract.
At the time of the confection of the contract, LSA-C.C. art. 2276 (now LSA-CC. art. 1898) provided that:
Neither shall parol evidence be admitted against or beyond what is contained in the acts, nor on what may have been said before, or at the time of making them, or since.
Ordinarily, when the words to a contract are clear, explicit and lead to no absurd consequences, the meaning and the intent of the parties must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence. Bank of Coushatta v. Patrick, 503 So.2d 1061 (La.App. 2 Cir.1987), writ den. 506 So.2d 1231 (La.1987).
Also, this court has stated in Chin v. Roussel, 456 So.2d 673 (La.App. 5 Cir. 1984), writ den. 459 So.2d 540 (La.1984):
"Legal agreements have the effect of law upon the parties, and they are bound by their agreement regardless of any seemingly harsh consequences, provided the agreement is not contra bonos mores or in violation of some prohibitory law. Further, courts are bound to give legal effect to all contracts according to the true intent of the parties. Intent is to be determined by the words of the contract, when same are clear, explicit and lead to no absurd consequences." (Citations omitted) Kenner Industries v. Sewell Plastics, Inc., 437 So.2d 1191 (La.App. 5th Cir.1983).
In the case before us, the contract in question is a pre-printed form entitled "AIRCO EQUIPMENT LEASE AGREEMENT." It states that Airco is to lease to Gulf American the Freezer for a term of five years, at a monthly rental rate of $1,620.00. The contract also gives Gulf American the option to purchase the Freezer at the end of the five year term. Addendum # 1 to the contract gives Gulf American the option to purchase the Freezer at any time prior to the expiration of the term and also gives Gulf American the option to cancel the lease within the first six months upon written notice.
The trial court determined, apparently from Turan's testimony, that the contract was a sale. However, Turan made no allegations of error with regard to the contract he was signing. Turan testified that Airco's representatives told him that the transaction would be set up as a lease-purchase agreement for financing reasons; however, he admitted that he knew that the document he signed was a lease-purchase agreement. Also, the six-month cancellation option was placed into the agreement *487 at Turan's request and was exercised by him.
It is clear from the words of the contract that the agreement in question was a lease with an option to cancel within six months and an option to purchase at any time during the lease term, and that it was the intent of the parties to effect a sale at some time during the five-year lease. This is substantially what the trial court held. Accordingly, we find no merit in this first assignment of error.
In its second assignment of error, Airco also alleges that the trial court erred in considering that the proposal it presented to Gulf American was a specific guarantee, as that proposal predated the written contract and constitutes parol evidence.
Ordinarily, while parol evidence is admissible to prove a written lease was altered or modified by a subsequent agreement, parol evidence pertaining to matters which preceded the written lease is generally inadmissible. Campesi v. Marino, 506 So.2d 177 (La.App. 5 Cir.1987). However, the Louisiana courts have long held that parol evidence is admissible when there are allegations of fraud, error, or mistake, to show that the instrument is not the expression of the actual intention of the parties. Daigle & Associates, Inc. v. Coleman, 396 So.2d 1270 (La.1981); First Financial Bank, FSB v. Austin, 514 So.2d 281 (La.App. 5 Cir.1987), writ den. 515 So.2d 1112 (La.1987).
In Kirsch v. Pier Orleans, Inc., 362 So.2d 1182, 1184-5 (La.App. 4 Cir.1978), the court said:
On appeal, as it did in the trial court, defendant contends that evidence of prior negotiations and agreements leading up to a written agreement are inadmissible to vary the terms of the agreement. This contention is indeed a correct general statement of law regarding parol evidence, but applies only when the parties have stated the terms of their contract in the form of a complete written integration.
The parol evidence rule simply excludes as irrelevant any prior negotiations or agreements when the parties intend to integrate these into one writing. The parol evidence rule does not make these facts irrelevant; the new agreement in writing makes these facts irrelevant, but only if the written agreement is a complete and accurate statement of all of the terms agreed upon by the parties.
Here, the evidence was introduced, not to show prior negotiations, but to show that the written lease was not the complete agreement between the parties. Parol evidence is admissible to show that the parties did not intend to substitute one written contract for all of their prior negotiations and agreements and that the written agreement was not assented to as a complete integration. Burton v. Lumbermens Mut. Cas. Co., 152 So.2d 235 (La.App. 4th Cir.1963), cert. den. 244 La. 895, 154 So.2d 767. Evidence is certainly admissible to show the circumstances under which the agreement was made and the purpose for which the written contract was executed. 3 Corbin, Contracts § 582 (1960); 9 Wigmore, Evidence § 2430 (3d ed. 1940); 25 La.L.Rev. 320-321 (1965); 30 Am.Jur.2d, Evidence § 1043 (1967); Hirsh v. Miller, 167 So.2d 539 (La.App. 4th Cir.1964), cert. den. 246 La. 909, 168 So.2d 821. [Emphasis supplied]
We find that the reasoning of Kirsch, supra, applies in this case, and that the evidence shows that it was Gulf American, and/or Charles Turan, who initiated the negotiations to enter into the contract for the purpose of obtaining a machine which could produce, quickly, among other products, small IQF shrimp in substantial amounts and that this was the primary purpose of the contract. In addition, we find that in their letter to Gulf American dated February 25, 1977, Airco stated that their model Freezer has these capabilities. We also find that the Freezer supplied by Airco could not and never did produce these IQF shrimp, as specified in the letter. Thus, the evidence shows that, at the very least, there was mistake in the contract and that the written contract did not contain a complete and accurate statement *488 of all of the terms and intentions agreed upon by the parties. If Airco's proposal of the machine's capabilities is not taken into consideration, then the contract is senseless because, contrary to the statement made in paragraph 6 of the contract (as discussed more in detail infra), nowhere in the contract is there contained the equipment's capabilities. Accordingly, we find that the trial court did not err in considering Airco's proposal which preceded the contract and this second assignment of error is without merit.
In its third assignment, Airco alleges as error the trial court's holding unenforceable the waiver of warranty and the limitation of liability clauses contained in the contract.
In its fourth assignment, Airco argues that the trial court erred in failing to apply the law of Louisiana National Leasing v. ADF Services, Inc., 377 So.2d 92 (La.1979), to the facts of this case.
These two assignments of error will be considered together.
LSA-C.C. art. 2695 provides:
The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same.
In Equilease Corporation v. Hill, 290 So.2d 423 (La.App. 4 Cir.1974), the court ruled that the statutory warranty of LSA-C.C. art. 2695 applied to the lease of immovables and of movables alike, and that it warranted that the leased object would be suitable for the use intended by the lessee, as well as warranting that the object was free of vice and defect.
The implied warranty of LSA-C.C. art. 2695 arises by operation of law in every contract of lease. However, this warranty may be dispensed with as a condition of the contract of lease. Tassin v. Slidell Mini-Storage, 396 So.2d 1261 (La. 1981); Louisiana National Leasing Corporation v. ADF Service, Inc., supra; Angelle v. Energy Builders Co., Inc., 496 So.2d 509 (La.App. 1 Cir.1986). The waiver of the implied warranty of quality must be clear and unambiguous. Prince v. Paretti Pontiac Co., 281 So.2d 112 (La.1973); Andrus v. Cajun Insulation Co., Inc., 524 So.2d 1239 (La.App. 3 Cir.1988). In order for a waiver of implied warranty to be effective, it must be 1) written in clear and unambiguous terms; 2) contained in the written contract; and 3) brought to the attention of the buyer or explained to him. Prince v. Paretti Pontiac Company, Inc., supra; Hendricks v. Horseless Carriage, Inc., 332 So.2d 892 (La.App. 2 Cir.1976); Reilly v. Gene Ducote Volkswagen, Inc., 549 So.2d 428 (La.App. 5 Cir.1989).
In this case, the contract contains the following waiver provisions:
"Paragraph 6. AIG makes no representations or warranties with respect to the Equipment other than that it shall meet the description thereof set forth elsewhere in this Agreement.

Paragraph 7. The User shall be solely responsible for the Equipment and any operation and use thereof.

Paragraph 9. Provided that the Equipment is operated, serviced and maintained by User in accordance with this Agreement and is used under normal conditions, AIG shall repair or replace, at its option, any part of such Equipment that is of AIG's own design or manufacture which is shown to be defective by User within 12 months from the date of delivery of the Equipment to User and with respect to which AIG receives written notice of such claimed defect no more than 15 days after the occurrence thereof. AIG shall have no such responsibility, however, if the Equipment has been subject to abuse, misuse, negligence or accident. This shall be User's sole and exclusive remedy for any defects in the Equipment. *489 Paragraph 14. AIG shall have no liability hereunder to User for consequential damages, under any circumstances."
While it may be clear from these terms that the lessee has no right to enforce some express warranties given by Airco, it does not appear that the terms of this contract indicate that all warranties, express or implied, are waived. Even if it can be said that some warranties were waived by these clauses, Turan's testimony, which is uncontradicted, reflects that these waivers were not called to his attention, nor were they explained to him, and, therefore, they are unenforceable under the above-quoted jurisprudence.
In addition, Airco's attempt to have all warranties waived, as contained principally in paragraph 6 of the contract quoted above, is so vague and misleading that it is worthless, since they attempt to make "no representations or warranties with respect to the Equipment other than that it shall meet the description thereof set forth elsewhere in this Agreement" because there is no description of the equipment, or its capabilities, set forth anywhere else in the agreement.
Airco also argues that Gulf American waived its right to collect any consequential damages arising out of the breach of contract.
A party may, under some circumstances, legally contract for a limitation on recoverable damages, but such an agreement must clearly indicate the intention of the parties. Rhodes v. Congregation of St. Francis, 476 So.2d 461 (La.Ap. 1 Cir. 1985). For a waiver of recoverable damages to be effective, as with the waiver of warranties, it must be 1) written in clear and unambiguous terms; 2) contained in the contract; 3) brought to the attention of the parties against whom it is to be enforced. Fontenot v. F. Hollier & Sons, 478 So.2d 1379 (La.App. 3 Cir.1985), amended and affirmed 491 So.2d 624 (La.1986).
Here, Turan testified that the waiver was not called to his attention. He further testified that he did not understand what the term "consequential damages" meant, and the meaning of this term was never explained to him. In fact, we note especially that this term is never explained or clarified anywhere in the contract. So, we, too, have no way of knowing what Airco meant by use of the term "consequential damages." Under these circumstances, it appears that the contract does not contain a valid waiver of Gulf American's right to collect consequential damages, if there are any, arising out of the breach of the contract.
Airco argues that Louisiana National Leasing Corporation v. ADF Services, Inc., supra, is dispositive of the case before us and should have been followed by the trial court. We find Louisiana National Leasing to be distinguishable in several respects and decline to apply it to the present case.
In the Louisiana National Leasing (hereinafter LNL) case, the lessee, ADF, leased a photocopier from LNL. The copier was manufactured by Spectrum Systems, Inc. (SS). The written lease contained the following waiver clause:
WARRANTIES Lessor will request the supplier to authorize Lessee to enforce in its own name all warranties, agreements or representations, if any, which may be made by the supplier to Lessee or Lessor, but Lessor itself makes no express or implied warranties as to any matter whatsoever, including, without limitation, the condition of equipment, its merchantability or its fitness for any particular purpose. No defect or unfitness of the equipment shall relieve Lessee of the obligation to pay rent or any other obligation under this lease. Id. at p. 94
The Supreme Court found in LNL that the waiver clause was a clear and unambiguous waiver of all express and implied warranties. The court in LNL also found that, despite ADF's contentions to the contrary, the waiver clause was called to its attention. In support of this finding, the court noted that block letters on the front of the contract called attention to the terms on its reverse, one of ADF's representatives was an attorney, and that ADF expected SS to warrant and service the machine, as evidenced *490 by the service contract between ADF and SS.
To the contrary in the case before us, paragraph 4 of the contract, which states that "All of the contract provisions set forth on the reverse side hereof are part of this Agreement", is in the same extremely small print as the rest of the contract, and is located several inches above the signature, and there is nothing about this statement which would call one's attention to it.
Appellants argue that LNL holds for the proposition that a waiver of warranty clause need not be called to the attention of the signing party when the transaction concerns a commercial, rather than a consumer, enterprise. However, subsequent cases have not adopted this view. In Haspel v. Rollins Protective Service, Inc., 490 So.2d 530, 533 (La.App. 4 Cir.1986), the court said:
Furthermore, we find that an artificial distinction between commercial enterprises and consumers is inappropriate. As illustrated by the Louisiana Supreme Court in Louisiana National Leasing Corp. v. ADF Service, Inc., 377 So.2d 92 (La.1979), sophistication and educational level, not commerciality, are the primary considerations.
See also Datamatic v. International Business Machines, 613 F.Supp. 715 (D.C.La. 1985), affirmed 795 F.2d 458 (5th Cir.1986).
However, the courts have found a waiver clause effective despite an allegation that it was not called to the attention of the signing party in Southern States Equip. v. Jack Legett Co., 379 So.2d 881 (La.App. 4 Cir.1980), where the printed stipulation was right above the signature line in forty-three separate dray receipts. Also, the signing party failed to object to the inclusion of the language upon discovery; in Capitol City Leasing Corp. v. Hill, 394 So.2d 1264 (La.App. 1 Cir.1981), when lessee admitted on the stand that the financing lessor told him specifically that there was no warranty running from the lessor to the lessee; and in Tassin v. Slidell Mini-Storage, Inc., 396 So.2d 1261 (La. 1981), where each lessee admitted to reading the contract for lease of a storage area in its entirety, including the clear waiver of liability, which stated: "... and Warehouseman shall not be responsible for any such losses, whatsoever."
In the case before us, Gulf American's representative was a man, whose formal education included several years of college and who was familiar with the shrimping business, who was accustomed to oral, rather than written transactions, and who was not an attorney, nor was his attorney ever involved or consulted. Also, the lessor was the manufacturer and not a third party lessor.
In addition, as discussed earlier herein, the waiver of fitness clause, which states only that Airco "makes no representations or warranties ... other than that it shall meet the description thereof set forth elsewhere in this Agreement" appears ambiguous in light of the fact that Turan had received written assertions as to the Freezer's capabilities only three days prior to the signing of the contract of lease.
Under all these circumstances outlined above, and, in all fairness, we find that the "waiver of fitness" contained in the lease of the Freezer was not effective and, for the same reasons, we also conclude that the waiver of consequential damages clause contained in the lease was unenforceable.
Therefore, we conclude that there is no merit to assignments of error numbered 3 and 4.
In assignment of error number five, Airco alleges that the trial court erred in applying the law of redhibition and products liability to this case. In his reasons for judgment, the trial judge said:
There has been some discussion in this case concerning whether or not the new products liability statute is retroactive or whether the fraud involved is constructive or actual and so forth. The Court concludes, however that the facts of this case lead to the same result under the fraud articles, the redhibition articles, the old or the new products liability laws, or, for that matter, the law of misrepresentation.
*491 The trial court then made findings with regard to the actual and legal bad faith of Airco in its dealings with Gulf American. It is clear from these reasons for judgment that the trial court did not apply the laws of redhibition and products liability in determining the outcome of this case. We, therefore, find that this assignment is without merit.
In several of Airco's assignments of error, namely 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 and 16, it challenges findings of fact made by the trial judge. It has been well established that an appellate court may not set aside the findings of fact made by the trial court in the absence of manifest error or unless the evidence shows that such finding is clearly wrong. Rosell v. Esco d/b/a Jolly Elevator Corp., 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Where there are two reasonable or permissible views of the evidence and the trial court chooses to find more credible one witness' testimony than another, the appellate court cannot reverse such finding because, in their judgment, they would have lent more credence to another witness' testimony instead. Under such conditions, great deference must be given to the finding of the trier of fact.
The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.
. . . . .
When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness' story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness' story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses that finding can virtually never be manifestly erroneous or clearly wrong. [citations omitted] Rosell, supra, at pages 844-845.
In assignments of error numbered six, seven and eleven, Airco challenges the trial judge's findings that the Freezer was defective and/or lacked capacity and was unsuited for its intended purpose.
The testimony established that Airco represented to Gulf American that its Freezer had the capacity to produce IQF 100-150 count shrimp at a rate of 1,200 lbs. per hour, or, in other words, that the Freezer had the capacity to individually quick freeze 120,000 to 180,000 shrimp each hour. The testimony also revealed that the loading area for these shrimp was around 2 feet long. Furthermore, these 120,000 shrimp had to be placed by hand onto the 2-foot long loading area to avoid clumping, a fact not made known to Turan. This method of loading was an impossibility, given the area of Turan's physical plant. As Airco's own employee testified, to load the shrimp in such a manner would result in a "Chinese fire drill."
Also established at trial was the fact that, once these shrimp were loaded onto the belt, they fell through the mesh and became stuck, causing the belt to "freeze up" and stop working.
Finally, the testimony established that the shrimp which were frozen individually were flat on one side, white and dehydrated.
*492 Given this factual testimony, accepted as credible by the trial judge, we see no manifest error in his ruling that the Freezer leased by Airco was defective in that it lacked capacity and was unfit for its intended use.
In assignments numbered eight, nine and ten, Airco alleges that the trial court erroneously found that Airco, as the manufacturer, by its assertions to Turan that the Freezer could process 1,200 pounds of 100-150 count shrimp per hour, was in legal and actual bad faith, that Airco's actions amounted to fraud and misrepresentation and that Airco's actions were both wanton and reckless.
In assignments of error numbered twelve through seventeen, the appellant alleges that the trial court erroneously found 1) a contract existed between Gulf American and Shore Lobster; 2) that Airco's actions in providing a defective Freezer led to Gulf American's inability to perform the contract and 3) that Gulf American was entitled to an award of damages and expenses from Airco arising from its inability to perform the Shore Lobster contract.
We first address the issue of whether the plaintiff proved the damages to which he alleged he was entitled. A plaintiff must prove his case before he is allowed to recover and, in order to prove damages, it is mandatory that he prove each and every element of the damages which he claims. Haggerty v. March, 480 So.2d 1064 (La.App. 5 Cir.1985).
Plaintiff's damages, as presented at trial, fall into two categories: 1) Damages for preparation of his plant to accommodate the Freezer and 2) damages for lost profits.
We note that the trial judge, in his computation of damages, does not specify which portion of the award was for Turan's damages, if any, in preparing his plant for the Freezer, which part, if any, was for shrimp damaged by the inability of the freezer to properly process the shrimp, and which portion of the award was for lost profits, if any, or how he arrived at these figuresor why.
Although plaintiff alleged in his pleadings that he had spent around $80,000.00 to prepare his plant for installation of the Freezer, we have carefully reviewed the record in connection with this claim and we find that the evidence, consisting of invoices and receipts, plus the logical interpretation of the plaintiff's testimony, which was largely uncontradicted and, considering plaintiff's testimony that many of his records were lost when his accountant's business was flooded, supports a finding that plaintiff expended $66,775.00 in preparation for installation of the Freezer.
A claim for lost profits will not be supported by mere estimate of losses. Loss of profit awards may not rest on speculation or conjecture unless direct evidence is not available to establish this element of damages. John Jay Esthetic Salon, Inc. v. Woods, 435 So.2d 1051 (La.App. 5 Cir.1983). "Loss of profits must be proved with reasonable certaintyi.e., the more probable than not standard." Bailes v. U.S. Fidelity & Guar. Co., 512 So.2d 633 (La.App. 2 Cir.1987). While the absence of independent, corroborating evidence may not be fatal to the plaintiff's burden of proof, the lack of even a minimal degree of detail or specificity as to the extent of loss precludes an award. Arteck Services v. Crown Point Industries, Inc., 473 So.2d 345 (La.App. 5 Cir.1985). Accordingly, this court, in Arteck, supra, upheld a determination that plaintiff failed to prove damages when the only evidence to support the claim for damages was plaintiff's self-serving testimony. To the same effect is Young v. South Central Bell Tel. Co., 412 So.2d 147 (La.App. 4 Cir.1982).
In this case, Turan offered no evidence in support of his loss of profits other than his own self-serving testimony regarding the terms of his agreement with Shore Lobster Company. He failed to offer any proof of the shrimp available to him for processing, of his actual cost of processing the shrimp, and of his potential profit margin. In this connection, we note that Turan failed to introduce into evidence the deposition of Noel Blackman, president of Shore Lobster Company, to support his testimony *493 of the details of the contract he entered into with Shore Lobster Company (see our discussion, infra). Accordingly, we find that Turan did not present sufficient evidence to prove, by a preponderance, his alleged lost profits.
Because we find Turan presented insufficient proof to show lost profits as a result of his inability to fulfill the Shore Lobster contract, we need not consider the issues of whether Turan proved that the Shore Lobster contract existed, whether Airco was aware of the Shore Lobster contract at the time it entered into the contract to provide the Freezer with Turan and, thus, whether lost profits were contemplated damages, and whether Airco was in bad faith so as to be liable for loss profits even if such profits were not contemplated by Airco at the time it contracted with Turan.
After oral argument and the submission of this case to this panel, Gulf's attorney attempted, via motions to this court, to introduce into the record an order signed by the trial court stating that the deposition of Mr. Noel Blackman had been admitted into evidence at the trial and to place said deposition into the record. These motions were taken under advisement, then referred to the merits, and are now denied for the following reasons.
Gulf, in these motions and in brief to this court, relies on C.C.P. art. 2132 in support of its contention that Mr. Blackman's deposition should be placed into the appellate record of this case. C.C.P. art. 2132 provides as follows:
Art. 2132. Same; correction
A record on appeal which is incorrect or contains misstatements, irregularities or informalities, or which omits a material part of the trial record, may be corrected even after the record is transmitted to the appellate court, by the parties by stipulation, by the trial court or by the order of the appellate court. All other questions as to the content and form of the record shall be presented to the appellate court.
Gulf argues that Mr. Noel Blackman's deposition was admitted into evidence at the trial court and is a material part of the record which is omitted from the record on appeal. However, the record shows that the plaintiff offered the deposition into evidence, alleging unavailability of the deponent to testify, and the defendant objected, alleging that the deposition had been taken for discovery purposes only and could not be used to perpetuate testimony. The trial court took the matter under advisement. No ruling on the admissibility of the deposition was ever subsequently rendered anywhere in the record. Under these circumstances, we find that the deposition was not admitted into evidence at the trial court level, and we are of the opinion that we, like the trial judge, cannot consider this deposition on this appeal.
Initially, we note that when evidence is not introduced into the record at trial due to an "oversight" or for other reasons, said evidence may not be introduced into the record at the appellate level. Jackson v. Wal Mart Properties, Inc., 443 So.2d 3 (La.App. 3 Cir.1983).
Secondly, the record does not show that the plaintiff established the proper foundation to allow a determination of whether the deposition was taken to perpetuate testimony and whether said deposition was admissible under the Louisiana Code of Civil Procedure and under our ruling in Boneno v. Lasseigne, 514 So.2d 276 (La. App. 5 Cir.1987).
Finally, we believe it to be obvious that the admission of the deposition into the record at this late date would cause undue prejudice to the defendant. LSA-C.C.P. art. 1450 provides for the use of part or all of a deposition at trial "so far as admissible under the Louisiana Code of Evidence applied as though the witnesses were then present and testifying." Allowing the introduction of the deposition for the first time at the appellate court level bars the defendant from objecting to any part of the deposition on the grounds of relevancy, hearsay or for any other reason provided by the Louisiana Code of Evidence.
In its last assignment, Airco alleges error in the trial court's dismissal of its reconventional demand against Gulf American *494 for rentals, carbon dioxide rentals and other expenses.
However, the record shows that the freezer leased was unsuitable for its principal intended purpose. Therefore, Gulf American was entitled to annulment of the lease. LSA-C.C. art. 2699. Since Gulf American is entitled to annulment of the lease, Airco is not entitled to receive the future rentals provided for therein. ADD Chemical Co. v. Gulf-Marine Fabricators, 345 So.2d 216 (La.App. 3 Cir.1977), writ den. 347 So.2d 263 (La.1977).
For all the reasons assigned above, the judgment of the trial court in favor of the plaintiff is affirmed to the extent discussed above; however, that portion of the judgment granting plaintiff damages in the amount of $680,000.00 is amended to grant plaintiff damages in the amount of $66,775.00, with legal interest thereon from date of judicial demand until paid and for all costs of the proceedings in the district court.
The plaintiff's motion to supplement his brief, and the plaintiff's motion to place Mr. Blackman's deposition in the record, are denied.
The costs of this appeal are to be borne equally by plaintiff and defendant.
AMENDED AND, AS AMENDED, AFFIRMED.
KLIEBERT, J., concurs with written reasons.
KLIEBERT, Justice, concurring.
I believe the trial judge and the esteemed majority writer erred in concluding the waiver of consequential damages contained in the lease agreement as paragraph 14 is unenforceable. Unlike those provisions dealing with the waiver of warranties which are clouded by the issuance of a written warranty in a proposal dated three days before the lease agreement, the waiver of consequential damages is clear and precise. Additionally, it is similar to that found in most business contracts today.
Contrary to the conclusion reached by the majority, there is nothing complex or mysterious about the meaning of "consequential damages." A mere look in Black's Law Dictionary shows it defined as "... such damage, loss or injury as does not flow directly and immediately from the act of the party, but only from the consequences or results of such act." Further, the mere existence of Addendum # 1 bargained for by plaintiff and granting to him a right to cancel the agreement belies any present contention the plaintiff was unaware of the provision waiving consequential damages contained in the executed agreement or that plaintiff was an unsophisticated or unknowledgeable consumer who has to be protected from the superior bargaining power of the defendant. As recognized by the majority, there is no public policy against a contractual provision waiving consequential damages. Nor should we interfere in agreements entered into by businessmen in a free democratic society unless they are contrary to public policy.
Since the majority concluded the plaintiff presented insufficient proof to support a claim for consequential damages, it was unnecessary to decide whether the provision waiving consequential damages was enforceable. Rather, to me, that issue should be left undecided as were the issues of whether (1) plaintiff proved the Shore Lobster contract existed, (2) Airco was aware of the Shore Lobster contract at the time it entered into the lease agreement with plaintiff, (3) lost profits were contemplated damages, and (4) Airco was in bad faith.
Although I have serious reservations over other conclusions reached by the majority writer, I concur in the results reached but not necessarily for the reasons stated by the majority.